# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

v.                                          **Case No. 8:15-CR-492-T-24JSS**

**JOSE QUINONES CAMACHO**
_____/

## SENTENCING MEMORANDUM

**COMES NOW**, the Defendant, Mr. Camacho, by and through undersigned counsel, and files this sentencing memorandum in support of a reasonable sentence. As grounds in support thereof, Mr. Camacho shows as follows:

Mr. Camacho, age 35, was born and raised in a remote fishing village near the Pacific Coast in Tumaco, Colombia. Mr. Camacho and his siblings were raised in extreme poverty, and their childhood characterized by a constant shortage of food and adequate clothing. Mr. Camacho's father, a farmer by trade, was unable to support the family. Mr. Camacho's mother attempted to earn money by cleaning shrimp, but was rendered permanently blind from the harsh chemicals in her workplace.

As a result of his family's poverty, Mr. Camacho began working to support his family at the age of 5. (PSR ¶35). At the age of 12, he found employment in the commercial fishing industry, laboring on small coastal boats in search of lobsters and other sea creatures that could be sold locally. Lacking any formal

1

education, Mr. Camacho is numerically challenged, and completely illiterate.

Mr. Camacho has shared a common law union with Miriam Quiñones Castillo for the last 17 years.  They have five children, ages 15, 14, 11, 13, and 8, whom he personally supports and has kept in school.  Mr. Camacho also provides partial support for his disabled mother and father.

Several years ago, Mr. Camacho moved with his family to the port city of Tumaco.  Despite its port activity, Tumaco is one of the poorest cities in South America.  The city is afflicted with a 70 percent poverty rate, plagued by violent right-wing paramilitary groups, and terrorized by cartels, which perpetrate drug trafficking, extortion, and civilian murder on a massive scale.   United State Department employees are not allowed to travel to Tumaco without special clearance. *See* Attachment 1

In Tumaco, Mr. Camacho and his family lived in a small house which he built on a *barrio* lot.  Feeling pressure to help his family escape the worst aspects of Tumaco, he signed on for the instant voyage in hopes of relieving his family's dire financial circumstance.   Mr. Camacho was not a member of any drug trafficking organization or a regular participant in drug trafficking.

When the smugglers approached Mr. Camacho, he knew it was a mistake to accept their proposition.   Yet, as an illiterate fisherman forced to support his immediate and extended family, the opportunity to earn what most consider a small

sum was perceived an irresistible windfall.

### Request for a mitigating role adjustment pursuant U.S.S.G. §3B1.2

In the PSR, the United States Probation Officer fails to identify any factors that warrant a minor role reduction. Mr. Camacho objected to this conclusion.

### Current state of §3B1.2, amended on Nov. 1, 2015

Since issuing Amendment 640 in 2002, the Commission has continued to be concerned about the improper under-application of the mitigating role adjustment. Recently, in a wide-ranging study of low-level offenders, the Commission concluded that the adjustment continues to be applied "inconsistently and *more sparingly than the Commission intended.*" U.S.S.G. Amendment 794 (emphasis supplied). Largely to encourage application of the adjustment to greater numbers of low-level offenders, the Commission issued Amendment 794, effective on November 1, 2015.

The most important change to the guideline under Amendment 794 was the addition of "a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment and, if so, the amount of the adjustment." U.S.S.G. Amendment 794. All five of the listed factors have specific implications for Mr. Camacho:

> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)   the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

(v)   the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. §3B1.2 App. N. 3(C).

**Factors (i) - (iv): understanding, planning, authority, discretion**

The criteria in factors (i) through (iv) focus on the defendant's understanding, planning/organizing function, decision-making authority, responsibility and discretion.  Mr. Camacho exhibited none of these attributes, and his participation was limited to the responsibilities of a hired deck-hand.  While he possessed rudimentary understanding of the voyage's illegality, he knew nothing of the over-arching operational details—such as the owner of the vessel or the ultimate destination of the cocaine.  Mr. Camacho was recruited by low-level service-providers, who themselves dealt with intermediaries within the drug trafficking organization.  Mr. Camacho was not involved in acquiring drugs, organizing the drug smuggling operation, or planning the route of the voyage.  Further, Mr. Camacho had no decision-making authority, or organizational

discretion.  In short, Mr. Camacho's role was "perform[ing] a limited function in the criminal activity."  U.S.S.G. §3B1.2 App. N. 3(A).  As the Application Note states, "[A] defendant who is convicted of a drug trafficking offense whose participation in that offense was limited to transporting or storing drugs . . . *may receive an adjustment under this guideline*." *Id.* (emphasis supplied).

### Factor (v): "benefit" from the crime

Similarly, determinative of Mr. Camacho's minor role is factor (v) added to Application Note 3(C): "the degree to which the defendant stood to benefit from the criminal activity."  Mr. Camacho was to receive only a small, one-time cash payment, un-correlated to the large value of the drugs transported.  The promised sum is unknown, but it seems to have been a few thousand dollars, enough for school tuition and minimal medical care for his mother.  At any rate, a miniscule, non-proprietary "benefit" of this type clearly meets the guidelines requirement for a mitigating role adjustment.  As the guideline states, "A defendant who is simply being paid to perform certain tasks *should be considered* for an adjustment under this guideline."  U.S.S.G. §3B1.2 App. N. 3(C) (emphasis supplied).

### Conduct "integral" or "indispensable" to the offense

As noted by the Commission in issuing Amendment 794, defendants historically have been improperly denied mitigating role adjustments because their conduct was "integral".  In Amendment 794, the Commission clarified that the fact

that a defendant's role was essential to the offense "does not alter the requirement . . . that the court must assess the defendant's culpability relative to the average participant in the offense." U.S.S.G. Amendment 794. "The fact that a defendant performs an essential or indispensable role in the criminal activity *is not determinative*. Such a defendant *may receive an adjustment under this guideline* if he or she is substantially less culpable than the average participant in the criminal activity." U.S.S.G. §3B1.2 App. N. 3(C) (emphasis supplied).

### **Drug quantity as a basis for denial of adjustment**

Amendment 794, states that a transporter of drugs—although accountable for the drugs he transported under relevant conduct—"*may receive*" a mitigating role adjustment. U.S.S.G. Amendment 794 (emphasis supplies). It is further instructive that in the list of factors courts are now directed consider, not one of the five factors refers to drug quantity. U.S.S.G. §3B1.2 App. N. 3(C) (emphasis supplied). Under the current guidelines, Mr. Camacho may not be denied a mitigating role adjustment on the grounds of drug quantity.

Should Mr. Camacho receive the requested 2-level adjustment for minor role, it would also reduce his base level determination under U.S.S.G. §2D1.1. Specifically, §2D1.1 (a)(5) provides, "if the defendant receives an adjustment under §3B1.2 (Mitigating Role); and (B) the base offense level . . . is "(iii) level 38, decrease by 4 levels." Where a defendant's base offense level is determined

pursuant to §2D1.1(a)(5), that level is additionally reduced based on the mitigating role, whether that be a 4-level minimal participant, and 2-level minor participant, or a 3-level intermediate participant reduction.  *See* U.S.S.G. §3B1.2 App. N. 6.

### Culpability compared to the "average participant"

The fundamental requirement for the minor role adjustment is that, "based on the totality of the circumstances," the defendant's role in the offense "makes him substantially less culpable than the average participant in the criminal activity."   U.S.S.G.  §3B1.2  App.  N.  3(A).   According  to  the  Sentencing Commission's Historical Notes to the 2015 Amendments, "average participant" refers narrowly to the defendant's "co-participants in the case at hand."  Even in these  narrow  circumstances,  however,  it  is  clear  that  Mr.  Camacho  was "substantially less culpable" than other participants.  He was not directly connected with the larger drug organization, did not plan or organize the voyage, did not procure the Go Fast, did not load the cocaine, did not provision the vessel with supplies, did not provide or operate the GPS navigating device, did not command others, and did not order the scuttling of the vessel when detected by authorities. In all such activities, Mr. Camacho had no say.  His role was that of a temporary hand hired by higher-ups to perform a limited, short-term set of menial tasks in exchange for a small, one-time cash payment unrelated to the value of the drug cargo.  Even in the narrow "case at hand," Mr. Camacho qualifies for the 2-level

minor role adjustment.

In the spirit of justice, Mr. Camacho is even less culpable when examined under a *true* "totality of the circumstances," which included the higher-level drug-trafficking conspirators who were actually responsible for Mr. Camacho's presence aboard the semi-submersible.  The *true* "average participants" were those who created, organized, and managed an international drug-trafficking organization; sourced and obtained hundreds of kilograms of cocaine at wholesale; paid for the construction of the specialized but disposable semi-submersible; arranged for the maritime transport of large quantities of cocaine to recipients in distant countries; and continue to reap huge profits from the overall enterprise oblivious of the fate of minor, disposable players such as Mr. Camacho.

In view of Mr. Camacho's minor and subordinate role in the conspiracy, and the intent and effect of the Sentencing Commission in issuing Amendments 640 and 794, it is clear that Mr. Camacho is entitled to a 2-level minor role reduction and a corresponding 4-level reduction in his base offense level pursuant to U.S.S.G. §2D1.1(a)(5).  With these two adjustments, his properly calculated total offense level is 27.  At total offense level 27 and criminal history category I, Mr. Camacho's advisory guideline imprisonment range is 70 to 87 months.

**Variance pursuant to *United States v. Booker* and 18 U.S.C. § 3553(a)**

Mr. Camacho's guideline range--without the mitigating role adjustment--is 108 months.  Under the advisory guidelines regime in place since *United States v. Booker*, 125 S. Ct. 738, 756 (2005), this Court is required to impose a sentence that is *reasonable*—that is, sufficient but not greater than necessary to meet the statutory purposes of sentencing set forth in 18 U.S.C § 3553(a).  Given the facts of this case, Mr. Camacho submits that a reasonable punishment would be a term of incarceration not exceeding 87 months.

**Application of 18 U.S.C. § 3553(a)**

Mr. Camacho regrets his commission of a serious federal crime and understands the need for punishment.  The Government has filed a 2 level U.S.S.G §5K1.1 motion.  He submits, however, that the nature and circumstances of his offense, and his personal history and characteristics, weigh in favor of a sentence less than his low-end guidelines range of 108 months in prison.

Mr. Camacho came to adulthood, and later raised his own family, in lawless barrios where competing criminal gangs routinely "restrict residents" movements, and recruit desperate people.  Growing up or as an unskilled, illiterate adult supporting a family in a city with over 50 percent unemployment, Mr. Camacho has not known any of the opportunity available to the poorest in the United States.  That circumstance must bear on the degree of blame for which he is held

personally responsible.

### The purposes of sentencing

Section 3553(a)(2) sets forth the purposes of sentencing, which can be summarized as:

(1)     just punishment;
(2)     deterrence;
(3)     protection of the public; and
(4)     rehabilitation.

Mr. Camacho submits that each of these purposes would be achieved by a sentence of 87 months.

### Just Punishment

Mr. Camacho's conduct, participating in an attempt to smuggle illegal drugs, was a violation of law and must be justly punished—constituting appropriate retribution while promoting respect for the law and demonstrating to the offender and to others the reprehensibility of the offense.  Mr. Camacho has no history of violence, and no violence was involved in the offense. Just punishment can be achieved with 87 months of incarceration.  This court should also consider 87 months would be particularly hard to bear in the case of an individual whose family members are outside the United States and are unlikely to be able to visit him in prison.

### Deterrence – specific and general

As for specific deterrence (i.e., specifically affecting Mr. Camacho), little statistical data is available regarding recidivism rates in cases like this, in which the offender is located outside the United States and is subject to personal and economic conditions that scarcely exist in this country.  For Mr. Camacho, 87 months in prison for this type of conduct, will send a message he will not forget. He may again find himself in desperate circumstances when released, but he will "think twice" about risking removal from his family a second time.  As for general deterrence: by any standard, 87 months in federal prison followed by summary deportation to a third-world country will surely be seen as severe punishment for an offense that took place entirely outside the United States and involved no weapons or violence.

### Protection of the Public

Mr. Camacho has no history of violence or of crimes against persons.  There is no other indication that he poses any danger to the public.

### Rehabilitation

Mr. Camacho reflecting on the wrong that he has done wishes to move forward, complete his punishment, and return to his family.  Given his need for vocational skills, it is particularly unfortunate that (as an undocumented alien) he will not qualify for prison rehabilitative programs such as job training.  In effect,

the time he spends in prison will be "pure punishment"—a further reason for limiting his sentence to 87 months and permitting him to return to his family and such gainful employment as is available.

### The kinds of sentences available (and related costs)

Since in this case only incarceration (followed by deportation) is available, the cost of this punishment is a relevant consideration.  At the rate of $30,621 per year (PSR ¶78), any incarceration beyond that which is necessary represents an unjustified expenditure of public funds.  Mr. Camacho submits that a sentence of 87 months is sufficient to accomplish the goals of sentencing at a justifiable cost.

## CONCLUSION

For the reasons stated herein, Mr. Camacho, respectfully urges this Court to impose a sentence of 87 months.  Such a sentence is reasonable in light of the advisory guideline range and the factors set forth at 18 U.S.C. § 3553(a).

DATED this 24th day of June, 2016.

Respectfully submitted,

DONNA LEE ELM
FEDERAL DEFENDER

**/s/ Frank W. Zaremba**
Frank W. Zaremba
Florida Bar No. 0277371
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Fax: (813) 228-2562
Email: Frank_Zaremba@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of June, 2016, a true and correct copy of the foregoing was furnished by using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following:

Matthew Perry, AUSA

**/s/ Frank W. Zaremba**
Frank W. Zaremba
Assistant Federal Defender

# ATTACHMENT 1

travel.state.gov    U.S. Passports &    Students Abroad    U.S. Visa    Intercountry Adoption    International Parental    |    Contact Us    Find U.S. Embassies
                    International Travel                                                          Child Abduction                                 & Consulates

SEARCH

travel.state.gov > Passports & International Travel > Alerts and Warnings > **Colombia Travel Warning**

Print    Email

# Colombia Travel Warning

LAST UPDATED: APRIL 5, 2016

Tens of thousands of U.S. citizens safely visit Colombia each year for tourism, business, university studies, and volunteer work. Security in Colombia has improved significantly in recent years, including in tourist and business travel destinations such as Bogota, Cartagena, Barranquilla, Medellin, and Cali. However, violence linked to narco-trafficking continues to affect some rural and urban areas. Despite significant decreases in overall crime in Colombia, continued vigilance is warranted due to an increase in recent months of violent crime, including crime resulting in the deaths of American citizens. This Travel Warning replaces the previous travel warning released on June 5, 2015.

There have been no reports of U.S. citizens targeted specifically for their nationality. While the U.S. Embassy has no information regarding specific and credible threats against U.S. citizens in Colombia, both the Revolutionary Armed Forces of Colombia – People's Army (FARC) and National Liberation Army (ELN) terrorist groups continue to condemn any U.S. influence in Colombia. The Department of State strongly encourages U.S. citizens to exercise caution and remain vigilant as terrorist and criminal activities remain a threat throughout the country. Explosions occur throughout Colombia on a regular basis, including in Bogota. Small towns and rural areas of Colombia can be extremely dangerous due to the presence of terrorists and criminal elements, including armed gangs (referred to as "BACRIM" in Spanish), that are active throughout much of the country. Violence associated with the BACRIM has spilled over into many of Colombia's major cities. These groups are heavily involved in the drug trade, extortion, kidnapping, and robbery.

Violence associated with crime is a threat throughout Colombia. During the period November 2014 to January 2016, there were several homicides of U.S. citizens in connection with robberies, including armed robbery on streets and in taxi cabs, public transport, home invasions, and muggings. The victims represented a mix of tourists, long-term residents and persons with dual U.S.-Colombian citizenship.

The incidence of kidnapping in Colombia has diminished significantly from its peak in 2000. However, kidnapping remains a threat. Terrorist groups and other criminal organizations continue to kidnap and hold civilians, including foreigners, for ransom. No one is immune from kidnapping on the basis of occupation, nationality, or other factors.

U.S. government officials in Colombia regularly travel to the major cities of Colombia such as Bogota, Medellin, Cali, Barranquilla, and Cartagena without incident. U.S. government officials and their families in Colombia normally are permitted to travel to major cities only by air. They may not use inter- or intra-city bus transportation, or travel by road outside urban areas at night. U.S. government officials in Colombia and their families are restricted to traveling within certain areas. This includes using the main highways to travel between Bogota and Bucaramanga, and between Bogota and Ibague. Personnel are allowed to drive between Manizales, Pereira, and Armenia and within the "coffee country" departments of Caldas, Risaralda, and Quindío. On the Caribbean coast, personnel are restricted to driving along Highway 90 from Cartagena, through Barranquilla to Santa Marta. Travel to all other areas of Colombia is off limits unless specific authorization is granted. All U.S. citizens in Colombia are urged to follow these precautions and exercise extra caution outside of the aforementioned areas.

For more detailed information on staying safe in Colombia, please see the State Department's Country Specific Information for Colombia. For the latest security information, U.S. citizens traveling abroad should regularly monitor the Bureau of Consular Affairs' internet web site, where the current Worldwide Caution, Travel Warnings, and Travel Alerts can be found. Follow us on Twitter and the Bureau of Consular Affairs page on Facebook as well.

Up-to-date information on security can also be obtained by calling 1-888-407-4747 toll free in the United States and Canada or, for callers outside the United States and Canada, a regular toll line at 001-202-501-4444. These numbers are available from 8:00 a.m. to 8:00 p.m. Eastern Time, Monday through Friday (except U.S. federal holidays). U.S. citizens living or traveling in Colombia are encouraged to enroll with the State Department's Smart Traveler Enrollment Program to obtain updated information on travel and security within Colombia. For any emergencies involving U.S. citizens in Colombia, please contact the U.S. Embassy or the closest U.S. Consulate as listed below.

For further information:

- See the State Department's travel website for the Worldwide Caution, Travel Warnings, Travel Alerts, and Country Specific Information for Colombia.
- Enroll in the Smart Traveler Enrollment Program (STEP) to receive security messages and make it easier to locate you in an emergency.
- Contact the U.S. Embassy in Colombia, located at Calle 24 Bis No. 48-50 Bogota, D.C., Colombia, at (+57-1) 275-2000, 8:00 a.m. to 5:00 p.m. Monday through Friday. After-hours emergency number for U.S. citizens is (+57-1) 275-2701.
- Call 1-888-407-4747 toll-free in the United States and Canada or 1-202-501-4444 from other countries from 8:00 a.m. to 8:00 p.m. Eastern Standard Time, Monday through Friday (except U.S. federal holidays).
- Follow us on Twitter   and Facebook  .

**Embassies & Consulates**

Assistance for U.S. Citizens

U.S. Embassy Bogota
Calle 24 Bis No. 48-50
Bogotá, D.C. Colombia

- Telephone
  +(57) (1) 275-2000

- Emergency After-Hours Telephone
  +(57) (1) 275-2701

- Fax
  +(57) (1) 275-4501

- Email
  ACSBogota@state.gov

- U.S. Embassy Bogota

VIEW MORE LOCATIONS



click to enlarge

## Learn About Your Destination

Enter a Country or Area [ GO ]

### *Enroll in STEP*

Enrolling in this free service will allow us to better assist you in case of an emergency while you are abroad.

[ ENROLL ]

About Us

Newsroom

Passport Statistics

Legal Considerations

Find a U.S. Embassy or Consulate

Contact Us

Careers

Consular Notification and Access

STAY CONNECTED

Dipnote Blog          @travelgov

Facebook              Youtube

Flickr                RSS

travel.state.gov | U.S. Passports & International Travel | Students Abroad | U.S. Visa | Intercountry Adoption | International Parental Child Abduction

Privacy   Copyright & Disclaimer   FOIA   No FEAR Act Data   Office of the Inspector General   USA.gov   GobiernoUSA.gov

This site is managed by the Bureau of Consular Affairs, U.S. Department of State.

 **GOV.UK**

- Home (https://www.gov.uk/)
- Passports, travel and living abroad (https://www.gov.uk/browse/abroad)
- Travel abroad (https://www.gov.uk/browse/abroad/travel-abroad)
- Foreign travel advice (https://www.gov.uk/foreign-travel-advice)

Foreign travel advice

# Colombia

- Summary Current travel advice
- Safety and security (https://www.gov.uk/foreign-travel-advice/colombia/safety-and-security)
- Terrorism (https://www.gov.uk/foreign-travel-advice/colombia/terrorism)
- Local laws and customs (https://www.gov.uk/foreign-travel-advice/colombia/local-laws-and-customs)
- Health (https://www.gov.uk/foreign-travel-advice/colombia/health)

- Entry requirements (https://www.gov.uk/foreign-travel-advice/colombia/entry-requirements)
- Natural disasters (https://www.gov.uk/foreign-travel-advice/colombia/natural-disasters)
- Money (https://www.gov.uk/foreign-travel-advice/colombia/money)
- Contact FCO Travel Advice Team (https://www.gov.uk/foreign-travel-advice/colombia/contact-fco-travel-advice-team)

Get updates

- email (https://www.gov.uk/foreign-travel-advice/colombia/email-signup)
- feed (https://www.gov.uk/foreign-travel-advice/colombia.atom)

# Summary

| | |
|---|---|
| **Still current at:** | 23 June 2016 |
| **Updated:** | 13 June 2016 |
| **Latest update:** | Summary - from 30 May 2016 a farmers' strike began in the rural areas of 16 departments; some roads have been blocked, including part of the Pan-American highway from Popayán to Cali, and confrontations are violent; you should avoid protests and follow the advice of local authorities if you're in an area where a protest is taking place |



Download map (PDF)
(https://assets.publishing.service.gov.uk/media/56cb323ce5274a14ef000003/160128_Colombia_pdf.pdf)

The Foreign and Commonwealth Office (FCO) advise against all travel to:

- the port of Buenaventura in the department of Valle de Cauca
- the port of Tumaco in the department of Nariño

The FCO advise against all but essential travel to:

- the departments of Putumayo, Arauca, Caquetá, Guaviare, Guainía, Vichada, and Norte de Santander
  (except their capital cities, as indicated on the map)
- the department of Cauca (except its capital Popayán and the road between the tourist site of the San
  Agustin ruins in Huila and Popayán city)
- the department of Chocó (except its capital Quibdó, the whale-watching towns of Nuquí and Bahía

Case 8:15-cr-00492-SCB-JSS   Document 64   Filed 06/27/16   Page 20 of 21 PageID 246

Solano, and the tourist site of Capurganá)

- the department of Nariño (except its capital Pasto and the Ipiales border crossing)
- the department of Meta (except its capital Villavicencio, and the tourist site of Caño Cristales); visitors travelling to Caño Cristales should only do so with a reputable tour company travelling by air to and from the town of La Macarena
- within 5km of the Venezuelan border in the departments of La Guajira, César and Boyaca
- rural areas in northern Antioquia, southern Cordoba, southern Valle de Cauca, and southern Bolivar (as indicated on the map)

From 30 May 2016 a farmers' strike began in the rural areas of 16 departments. Some roads have been blocked including part of the Pan-American highway from Popayán to Cali, and confrontations are violent. You should avoid protests and follow the advice of local authorities if you're in an area where a protest is taking place.

At around 9pm on 20 April 2016, 2 explosions were reported in Bogota, the first on Calle 109 with Carrera 45 (in the north of the city) and the second on Avenida Ciudad de Cali with Calle 26 (near Bogota El Dorado Airport). You should be especially vigilant and follow the advice of local authorities.

Cases of locally transmitted Zika virus have been confirmed in the last 3 months. You should follow the advice of the National Travel Health Network and Centre (http://travelhealthpro.org.uk/news-search/? loc=all&dis=2332&mnth=year) and discuss your travel plans with your healthcare provider, particularly if you're pregnant or planning to become pregnant.

Main roads are generally safe within daylight hours. See Road Travel (https://www.gov.uk/foreign-travel-advice/colombia/safety-and-security)

The departmental capitals of Amazonas, Vaupes and Guainía are only accessible by air due to the lack of road infrastructure in these departments.

The Venezuelan government has closed several major border crossing points between the Venezuelan states of Tachira and Zulia and the Colombian departments of La Guajira and Norte de Santander until further notice due to concerns about security and smuggling. You should avoid crossing from Colombia into Venezuela by land. Seek up-to-date advice from the local authorities if you're travelling near the border areas affected.

There is a high threat from terrorism. See Terrorism (https://www.gov.uk/foreign-travel-advice/colombia/terrorism)

The security situation can change very quickly in many areas of the country. You should pay close attention to warnings issued by the Colombian authorities. In general, the more remote the area, the greater the potential threat to your safety. You should be particularly cautious and vigilant during any major events and in crowded places.

Despite the high levels of crime, most visits to Colombia are trouble-free. See Crime (https://www.gov.uk/foreign-travel-advice/colombia/safety-and-security)

The Overseas Business Risk service (https://www.gov.uk/government/collections/overseas-business-risk) offers information and advice for British companies operating overseas on how to manage political, economic, and business security-related risks.

Take out comprehensive travel and medical insurance (https://www.gov.uk/foreign-travel-insurance) before you travel.

## Travel abroad

- Hand luggage restrictions at UK airports (https://www.gov.uk/hand-luggage-restrictions)
- Driving abroad (https://www.gov.uk/driving-abroad)
- More (https://www.gov.uk/browse/abroad/travel-abroad)

## Passports, travel and living abroad

- Renew or replace your adult passport (https://www.gov.uk/renew-adult-passport)
- More (https://www.gov.uk/browse/abroad)